ADAMS vs. SCHNEIDER ELECTRIC USA, 101 Mass. App. Ct. 516

 
 MARK A. ADAMS vs. SCHNEIDER ELECTRIC USA.

101 Mass. App. Ct. 516
 December 14, 2021 - August 17, 2022

Court Below: Superior Court, Middlesex County
Present: Green, C.J., Meade, Rubin, Henry, & Singh, JJ. [Note 1]

 

No. 21-P-158.

Anti-Discrimination Law, Age, Termination of employment, Prima facie case, Burden of proof. Employment, Discrimination, Termination. Practice, Civil, Summary judgment, Burden of proof.

Discussion of the heavy burden of persuasion faced by an employer seeking summary judgment in an employment discrimination case. [524-526]

In a civil action brought in Superior Court by a plaintiff alleging age discrimination arising from the termination of his employment by his former employer (defendant), the judge erred in granting summary judgment in favor of the defendant, where there was evidence of persistent, pervasive, and material remarks from which a fact finder could find that management, in implementing a series of reductions in force (RIFs), did not treat age neutrally; and where a rational fact finder could find that the individual decision maker was aware of this animus and therefore selected workers over the age of fifty, including the plaintiff, for the RIF in accordance with company policy. [526-531] Meade, J., dissenting, with whom Singh, J., joined.

Civil action commenced in the Superior Court Department on October 11, 2017. 

 The case was heard by William M. White, Jr., J., on a motion for summary judgment.

 Robert S. Mantell (Ilir Kavaja also present) for the plaintiff.

 Christopher W. Kelleher for the defendant.

 HENRY, J. The plaintiff, Mark A. Adams, a former employee of Schneider Electric USA (Schneider or company), appeals from a summary judgment entered in favor of Schneider on his age 

 Page 517 

discrimination claim. [Note 2] See G. L. c. 151B, § 4 (1B). The summary judgment record in this case contains something rarely seen in discrimination cases: an e-mail trail documenting that Schneider was so concerned about its "aging" Boston work force that it instituted a series of reductions in force (RIF) designed to shed older workers to make room for "young talent." Viewed in the light most favorable to the nonmoving party, here Adams, a rational fact finder could find that the company engaged in a systematic effort to replace older workers, including Adams, to make room to hire younger ones, and that Adams lost his job as a result.

 Because there were facts in dispute from which a jury could find that age was not "treated neutrally" either in calling for the RIF or in selecting Adams for the RIF, summary judgment should not have been granted. Accordingly, we reverse.

 Standard of review. In reviewing a grant of summary judgment, we assess the record de novo and take the facts, together with all reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. See Godfrey v. Globe Newspaper Co., 457 Mass. 113, 119 (2010). "[T]he court does not 'pass upon the credibility of witnesses or the weight of the evidence [or] make [its] own decision of facts.'" Shawmut Worcester County Bank, N.A. v. Miller, 398 Mass. 273, 281 (1986), quoting Attorney Gen. v. Bailey, 386 Mass. 367, 370, cert. denied, 459 U.S. 970 (1982). Viewing the facts in this light, we then determine whether the moving party has affirmatively shown that there is no real issue of fact, "all doubts being resolved against the party moving for summary judgment." Id. The record at hand, viewed with these principles in mind, showed the following.

 Factual background. Schneider is a large global conglomerate with offices and facilities located in one hundred countries. Schneider has numerous divisions and subdivisions or "departments," and a complicated organizational structure. At all relevant times, Adams was employed as an electrical engineer in the secure business power group of the home and business network in 

 Page 518 

the research and development subdivision (HBN R&D). [Note 3] He worked out of Schneider's Boston One Campus in Andover (BOC or Boston). [Note 4] 

 Around 2012, Adams began working on Schneider's battery quality initiative project supporting the field quality engineering and procurement teams headed by William Kabai and Christopher Granato. As a member of the "Battery A-team," Adams visited suppliers all over the world, investigating battery failures and fixing problems, assisting with the development of processes to improve quality, writing protocols and checklists for suppliers, auditing suppliers to ensure they were complying with manufacturing standards, and validating potential new suppliers. 

 In 2015, Adams began reporting to Mirza Akmal Beg, who also contributed to the battery quality initiative; the two spoke dozens of times about battery failures. In 2016, Adams was pulled from the battery quality initiative to work on the restricted other hazardous substances project (ROHS), an important engineering project of HBN R&D. [Note 5] That year, Schneider implemented a number of internal reorganizations and two RIFs. 

 1. The RIFs. Amanda Arria was a human resources (HR) leader for the company's Boston office during the time period relevant to the layoffs. [Note 6] She stated that she "partner[ed] with the leadership team to ensure we have the right people strategies in place for the business success." In October 2015, fifteen months before the January 2017 RIF through which Adams was terminated, Colin Campbell, vice-president of the information technology division (ITD), wrote in an e-mail message to Arria that the "[b]usiness [p]ower team in Andover needs age diversity. The embedded system team leader recognizes this and has been stocking his team with young talent. I'd like to encourage this more." In the months that followed, the company did just as Campbell suggested. 

 From April 2016 to January 2017, the company conducted 

 Page 519 

three RIFs. Twenty-three of twenty-four terminated employees were over the age of forty and twenty-two of the twenty-four were over the age of fifty. In an April 2016 RIF, six of seven terminated employees were over the age of forty and five of seven were over fifty. In a May 2016 RIF, all nine terminated employees were age forty-eight or older and six of the nine were over age fifty. Adams was terminated by the company in January 2017 at the age of fifty-four. All eight of the employees selected for this third RIF that included Adams were over the age of fifty. 

 2. Colby's selection of Adams for the January 2017 RIF. In December 2016, the senior vice-president of HBN, Pankaj Sharma, "gave cost take-out targets to each of his leaders." Sharma informed Kenneth Colby, who had recently been promoted to the position of director of engineering of HBN R&D, that he needed to cut twenty-two percent of his budget, the equivalent of around €1.7 million. [Note 7] Sharma, whose office was in Singapore at that time, left the specifics of how to meet the goal up to Colby. Colby understood that because the majority of his budget was spent on personnel, that meant the majority of the reduction would have to be a reduction in the number of employees, referred to by the parties as "headcount." Once Bin Lu was hired as vice-president of HBN global R&D in February of 2017, he supervised Colby. 

 Colby testified as follows as to how he came to include Adams in the January 2017 RIF: Colby approached Jim Munley, the vice-president of the project management office, his boss in his previous position, for guidance. Munley provided Colby with three pieces of advice in making his selections: look for employees who are working the majority of their time outside of HBN R&D, supporting other teams; select employees whose loss would have the least impact on the HBN R&D team and goals; and consider consolidating management positions. After evaluating and ranking his employees, Colby selected eight for layoff, including a manager and Adams. Their ages ranged from fifty-four (Adams) to sixty-two. 

 Colby also testified that before making his selections, he prepared a spreadsheet listing factors such as "pros," "cons," 

 Page 520 

"impact," and salaries. Under Adams's "cons," Colby wrote, among other things, that he "[d]oes not care for standard [R&D] work." Colby explained that Adams "really enjoyed" field quality work and all aspects of the work supporting the field quality team; in contrast, Adams did not really enjoy the HBN R&D ROHS work assigned to him (on which he spent around twenty-five percent of his time). As for the impact posed by Adams's separation, Colby concluded that there would be a "big impact short-term" on the ROHS work and a "huge impact" on the battery initiative supporting other HBN subdivisions. Under comments, Colby questioned whether Adams could be moved to field quality engineering. One of the two managers on the final RIF list of eight was selected by someone other than Colby. 

 In January 2017, Colby met with Sharma, Gregoire Rougnon from "finance," Munley, Arria, and Michelle Gautreau (an HR employee who reported to Arria) to review every person on the RIF list and the potential business and financial impact on the company from each separation. Before the RIF, Colby's reports included thirty-eight employees ages forty and over and eleven employees under age forty. [Note 8] All employees Colby selected for the January 2017 RIF were age fifty-four or older.

 The record reflects that Colby had the discretion to inquire about transferring Adams to another department, which would have met Colby's need to reduce his budget while saving Adams's job. Considering the evidence in the light most favorable to Adams, Adams was key to Granato's department (Granato was a peer of Colby and Kabai). Yet neither Colby nor anyone else gave Granato advance notice that Adams would be in Colby's RIF. Granato learned after the fact that Adams was terminated. Colby did give advance warning to Kabai that Adams would be in the RIF, but not that Colby had asked at that time to move Adams to Kabai's department. [Note 9] 

 On January 27, 2017, Colby called Adams at home and informed him of his termination, effective January 30, 2017. [Note 10] He instructed Adams not to return to the office. HR followed up the call with written notification and a severance package offer, 

 Page 521 

which Adams declined. [Note 11] 

 Once the January 2017 RIF was announced, Granato and Kabai discussed trying to keep Adams, but Colby was not involved in that conversation. Granato had funding to retain Adams in some capacity and asked Colby about the possibility. Colby dissuaded Granato from trying to retain Adams. Instead, Colby assured Granato that "they'd figure out something to support [Granato's] project going forward." In the light most favorable to Adams, a jury could infer that Colby failed to tell Granato in advance of the RIF and Colby thwarted Granato's attempt to retain Adams in order to reduce the number of older workers. 

 3. Post-RIF evidence. In a series of e-mail messages following the three RIFs, the highest tiers of management reviewed the status of their plan to reduce the number of older workers to make room to hire recent college graduates. In fact, following the RIFs in 2016 and January 2017, there was an active effort to recruit recent college graduates. [Note 12]

 A plethora of e-mail messages and presentations in 2017 referred to the company's desire to eliminate older workers in favor of "early career" hires, explicitly defined as hires under age thirty. An analysis of the Boston office compared to company locations in other countries described weaknesses in the Boston workforce as, among other things, "aging" and "[l]ow energy level and speed." [Note 13], [Note 14] 

 Page 522 

 In May 2017, Jiri Cermak, a senior vice-president of HR, sent an e-mail message to Arria and Brian Gough, who was Arria's peer for other businesses within the ITD. Cermak attached a PowerPoint presentation that suggested, among other things, "[m]ore early career talents," but noted that "[w]e can not increase SFC ? need to create the space." [Note 15] Arria testified that "SFC" means operating expenses. Other presentations also emphasized the need for early career talents.

 The meaning of the euphemism "create the space" was fleshed out more explicitly in an e-mail message two months later. In July 2017, Arria sent a message to Lu, Colby's boss, and forwarded that message to Sharma. Sharma was the leader of HBN, the superior of Colby's superior; Colby agreed that Sharma was "the big boss." Arria wrote, "I have been thinking more about the age demographic challenges we are facing in BOC (and to some extent in Taiwan as well), and our desire to make some budget/headcount room to hire some junior level talent. I am also excited about the university partnerships we discussed a few weeks ago, as a feeder group to accomplish this" (emphasis added). [Note 16]

 In another e-mail message in July 2017, Arria wrote to Cermak that the 2017 RIF was part of a continuing effort by the company to reduce the number of older employees to create room to hire younger employees. She stated, "As you are aware we did a lot of activity in the beginning of the year, but have a few creative ideas we are flushing out around early retirement packages to continue 

 Page 523 

to make room for more early career talent" (emphasis added). She reiterated the point in another July 2017 e-mail message to Cermak: "As you are aware most of our action have already occurred earlier this year and are noted here, but we do have some ideas around offering an early retirement package which would also help us make some room for additional early career hires" (emphasis added). She attached a slide listing those employees who had been laid off in 2017, which listed Adams as an involuntary departure. From this document a jury could infer that the January 2017 RIF that resulted in Adams's termination was part of the "activity in the beginning of the year," and that Adams was one of the older workers involuntarily separated to make room for younger hires. [Note 17]

 By August 2017, the company had conducted an analysis of its talent. However, it only analyzed employees who fell into certain age demographics -- "Early career," meaning "age under 30," and "Mid career," meaning "age 30-40." Occasionally someone outside these age ranges was included "if they are close to the age limits." The company did not analyze the talent of any worker over age forty-two. 

 The written record also offers evidence that at some point in 2017, Colby was aware of his company's preference for young talent. For example, in September 2017, Colby explicitly instructed another employee to "hold off" on hiring experienced workers while Colby, Gautreau, and Lu met to discuss college recruiting. Kaushal Patel indicated in an e-mail exchange with Gautreau and Colby a desire to hire "more specialized highly qualified individual as opposed to 1 to 3 year experience." Later in the e-mail exchange, Colby acknowledged that Patel was "referring to hiring people with experience" whereas Gautreau was referring to a college recruiting trip for new hires. Colby directed Patel to "hold off" on "hiring people with experience." Colby also was aware that the company considered early career talents to be under thirty and midcareer talents to be ages thirty to forty. 

 A November 2017 e-mail message from Lu to Colby included the goal "[i]mprove BoC team talent demographics mix though early retirement program and university fresh talent recruiting." 

 Page 524 

Colby was aware of at least one other presentation offering guidelines for midcareer and early career potentials. 

 The drumbeat continued in January 2018, with Lu giving a companywide presentation to leaders stating that the R&D department "[n]eeds immediate improvement on demographics and diversity" and comparing the percentage of employees over age fifty in the R&D department companywide (seventeen percent) with the Boston R&D department (forty-five percent). The company continued to want "early career talents" and "high potential young talents." 

 Discussion. 1. Employment discrimination framework. "In order to prevail at trial, an employee bringing a complaint under G. L. c. 151B, § 4, must demonstrate four things: [(1)] that [the employee is] a member of a protected class; [(2)] that [the employee was] subject to an adverse employment action; [(3)] that the employer bore 'discriminatory animus' in taking that action; and [(4)] that that animus was the reason for the action (causation)." [Note 18] Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 680 (2016). Here, as is typical, the plaintiff's membership in a protected class and the adverse employment action are undisputed. "Because . . . direct evidence [of the elements of discriminatory animus and causation] rarely exists, . . . an employee plaintiff [asserting discrimination] may also survive [a summary judgment motion] by . . . using . . . [a] three-stage, burden-shifting paradigm" (quotations and citations omitted). Id. at 680-681. [Note 19]

 "In the first stage [of this paradigm], the plaintiff has the burden 

 Page 525 

to [establish] . . . a prima facie case of discrimination" (citation omitted). Bulwer, 473 Mass. at 681. Such plaintiffs must provide "evidence that [(a) they are] a member of a class protected by G. L. c. 151B; [(b) they] performed [their] job at an acceptable level; [(c) they were subject to an adverse employment action, including] terminat[ion]; and . . . [(d) the adverse employment action] occurred in circumstances that would raise a reasonable inference of unlawful discrimination." Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 41, 45 (2005). For a termination, part (d) requires the employee to prove the "employer sought to fill [the employee's] position by hiring another individual with qualifications similar to [the terminated employee]." Id. at 41. For an RIF, part (d) is "nonsensical." Id. In an RIF case, the plaintiff may satisfy part (d) "by producing some evidence that [the RIF] occurred in circumstances that would raise a reasonable inference of unlawful discrimination." Id. at 45. 

 "In the second stage, the employer can rebut the presumption created by the prima facie case by articulating a legitimate, nondiscriminatory reason for [the adverse employment action]" (citation omitted). Bulwer, 473 Mass. at 681. 

 "In the third stage [of the paradigm], the burden of production [-- the plaintiff employee's obligation to come forward with evidence to support their claim --] shifts back to the plaintiff . . . , requiring the [plaintiff] to provide evidence that 'the employer's articulated justification [for the adverse employment action] is not true but a pretext" (citation omitted). Bulwer, 473 Mass. at 681. See Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 117 (2000) (employee may meet third stage "by showing that the reasons advanced by the employer for making the adverse decision are not true"). In this third stage, "Massachusetts is a pretext only jurisdiction" (citation omitted). Bulwer, supra. [Note 20] "To survive a motion for summary judgment, the plaintiff 

 Page 526 

need only present evidence from which a reasonable jury could infer that 'the [employer's] facially proper reasons given for its action against [the employee] were not the real reasons for that action.' The case can then proceed to trial, at which point, 'if the fact finder is persuaded that one or more of the employer's reasons is false, [the fact finder] may (but need not) infer that the employer is covering up a discriminatory intent, motive or state of mind.' In other words, a fact finder at trial may infer that, '[c]ombined with establishment of a prima facie case . . . , a showing of pretext eliminates any legitimate explanation for the adverse hiring decision and warrants a determination that the plaintiff was the victim of unlawful discrimination'" (citations and footnotes omitted). Id. at 682. 

 While the plaintiff may have the burden of persuasion at trial, "the burden of persuasion at summary judgment remains with the [employer], who, 'as the [party moving for summary judgment, has] the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, even if [the employer] would not have the burden on an issue if the case were to go to trial'" (citation omitted). Bulwer, 473 Mass. at 683. 

 "In cases involving claims of employment discrimination, a defendant employer faces a heavy burden if it seeks to obtain summary judgment." Sullivan, 444 Mass. at 38. "[S]ummary judgment remains 'a disfavored remedy in the context of discrimination cases based on disparate treatment . . . because the ultimate issue of discriminatory intent is a factual question.' [An employer's] motive 'is elusive and rarely is established by other than circumstantial evidence,' therefore 'requir[ing] [a] jury to weigh the credibility of conflicting explanations of the adverse hiring decision'" (citation omitted). Bulwer, 473 Mass. at 689.

 2. Questions of material fact. We conclude, as did the motion judge, that Adams established a prima facie case of age discrimination. See Sullivan, 444 Mass. at 40 (plaintiff's initial "burden is not onerous"). By all accounts, Adams was a good employee. At the time of his termination at the age of fifty-four, he was performing his job well. His statistical and expert evidence is sufficient to show that his "layoff occurred in circumstances that 

 Page 527 

would raise a reasonable inference of unlawful discrimination." [Note 21] Id. at 45. See Scarlett v. Boston, 93 Mass. App. Ct. 593, 597-599 (2018).

 Adams does not seem to challenge Schneider's satisfaction of its second-stage burden, but even if he did, we conclude that Schneider met its burden to articulate a nondiscriminatory reason for terminating Adams -- either that the RIF was necessary for cost reasons or that Colby used nondiscriminatory criteria for selecting Adams and the other workers in the RIF. See Sullivan, 444 Mass. at 50-54. 

 Schneider's motion for summary judgment still should have been denied for two reasons. 

 a. The RIF was tainted. The first reason is that there is evidence from which a fact finder could find that the RIF itself was tainted even if the person who selected the employees for the RIF -- Kenneth Colby -- implemented the RIF neutrally. See Bulwer, 473 Mass. at 684. Schneider argues that the reason to conduct the RIF was nondiscriminatory (cost) rather than discriminatory (age). In fact, Adams disputed this premise and produced evidence of a pervasive and explicit corporate strategy to terminate some older workers to make room to hire younger workers. In the light most favorable to Adams, age was not treated neutrally in deciding to initiate the RIF in the first place. On this basis alone, the motion for summary judgment should have been denied. See Johansen v. NCR Comten, Inc., 30 Mass. App. Ct. 294, 299-300 (1991) ("expression of conviction by an executive who has personnel responsibilities that 'new young blood' is needed, followed by the discharge of persons over forty and their replacement by persons under thirty, makes for powerful evidence of age discrimination, but some inferential reasoning is required to link it to the discharge of a particular person"). [Note 22]

 Even if Colby were the sole decision maker for which particular 

 Page 528 

employees would be included in the RIF and the innocent pawn of an undisclosed corporate strategy tainted by unlawful discriminatory animus, a rational fact finder could conclude that the RIF was unlawful. "An employer [may not] insulate its decision by interposing an intermediate level of persons in the hierarchy of decision . . . ." Bulwer, 473 Mass. at 688. "[T]he motives of the [corporate managers] should be treated as the motives for the decision." Id., quoting Trustees of Forbes Library v. Labor Relations Comm'n, 384 Mass. 559, 569-570 (1981). [Note 23] 

 It is true and beside the point that many older workers survived the RIF. Adams is not arguing that the company intended to eliminate every older worker, and he need not prove as much. In other words, it does not matter that a number of older workers survived the RIF. Adams contends that the company used the RIF to eliminate him and several other older workers to make room to hire younger ones. Adams need only prove that Schneider made progress towards its stated goal, not that it reached perfection. [Note 24] Whether the company's design was to terminate older workers in favor of hiring younger ones is, on this record, a question of fact that a jury should resolve.

 This evidence of corporate strategy against older workers cannot be dismissed as "stray remarks" by nondecision makers that are remote in time. Whether a statement demonstrating illegal animus is a discriminatory remark that is material for purposes of G. L. c. 151B, § 4, depends on the speaker and the context. 

 Page 529 

Statements made by those who have power to make employment decisions -- here Sharma (the "big boss") and Arria -- are not stray remarks. See Wynn & Wynn, P.C. v. Massachusetts Comm'n Against Discrimination, 431 Mass. 655, 667 (2000). Given the evidence of this company's continued concern about having too many older workers and stereotyped thinking about older workers ("[l]ow energy level and speed"), a reasonable fact finder could interpret these remarks as ageist and, when considered with evidence of disparate treatment, would be permitted to rely on them to support a finding of discrimination. See Bulwer, 473 Mass. at 686-687. 

 Nor are the remarks remote in time. While many of the documents are after the date of the RIFs, they demonstrate a continuing course of conduct before and after the RIFs that reveals Schneider's thinking at the time of the January 2017 RIF. Remarks after the adverse employment action can still be relevant to the employer's contemporaneous thinking. See Brown v. Trustees of Boston Univ., 891 F.2d 337, 350 (1st Cir. 1989), cert. denied, 496 U.S. 937 (1990). See also Diaz v. Jiten Hotel Mgt., Inc., 762 F. Supp. 2d 319, 333-338 (D. Mass. 2011) (chronicling use and misuse of "stray remarks" doctrine). The remarks here are the opposite of stray remarks -- they are a window into the souls of the decision makers. See id. at 323 (it was for jury to decide whether ageist remark was "window on [a manager's] soul, a reflection of his animus, or arguably, just a slip of the tongue somehow unrelated to his 'true' feelings").

 The company's ageist remarks were persistent, pervasive, and material to whether the decision to conduct an RIF was itself tainted. While the company might not yet have hired the younger workers at the time of suit, if it cleared out the older workers to set the foundation for its plan, that would be sufficient discriminatory animus to permit a finding of liability.

 b. Discriminatory selection. Summary judgment should have been denied for a second reason. A rational fact finder could find that Colby was aware of management's age animus and therefore selected workers over age fifty, including Adams, for the RIF in accordance with company policy. A fact finder also could conclude that Colby scuttled efforts of another department leader to retain Adams in some capacity. 

 As a general matter, evidence of corporate state of mind against older workers and in favor of early career hires is relevant to and probative of discriminatory animus. See Conway v. Electro Switch 

 Page 530 

Corp., 825 F.2d 593, 597 (1st Cir. 1987) ("evidence of a corporate state-of-mind or a discriminatory atmosphere is not rendered irrelevant by its failure to coincide precisely with the particular actors or timeframe involved in the specific events that generated a claim of discriminatory treatment"). Here, Sharma directed Colby to reduce his budget by twenty percent, and Colby knew that meant headcount. Moreover, Colby met with the architects of the plan, Sharma and Arria, during the time that employees were being selected for the RIF, and a rational jury could infer that the wishes of senior management were expressed in those meetings, particularly where every person Colby selected for the RIF was over fifty. "The battle plan of the admiral is a valid datum in assessing the intentions of the captain of a single ship in the flotilla." Freeman v. Package Mach. Co., 865 F.2d 1331, 1342 (1st Cir. 1988). See Finney v. Madico, Inc., 42 Mass. App. Ct. 46, 51 (1997) ("finder of fact could conclude that the [decision maker] appointed by the Japanese corporate parent would not be deaf to the views the Japanese managers had expressed about women managers"). [Note 25] 

 That Colby selected eight people over age fifty is evidence that he understood the company strategy to discriminate. Adams's expert witness, Dr. Craig Moore, performed a statistical analysis of the ages of the employees in the decisional unit affected by the company's 2017 RIF. He concluded that the RIF had a disparate impact on workers fifty years of age and older. The dissent dismisses this analysis because Moore did not account for the company's stated nondiscriminatory reason for selecting Adams. This misses the point. Moore analyzed the RIF as a whole and would testify that "one could reject the hypothesis that age was not a factor in the selection of those terminated with only 9 chances in 1000 of being wrong." In Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 402 n.31 (2016), the Supreme Judicial Court acknowledged the employer's challenge that the statistical analysis did not account for the reasons for individual employment decisions but noted that the interpretation of the statistical data, and the weight to be accorded it, is for the finder of fact.

 Moreover, a rational jury could infer from Colby's interactions, or lack thereof, with Granato that Colby knew that his bosses wanted to clear out older workers and that Colby carried out the 

 Page 531 

plan. Colby did not give Granato advance notice that Adams would be in the RIF, even though terminating Adams put Granato's group's goals in jeopardy. And when Granato approached Colby after the RIF about rehiring Adams because Granato had some room in his budget, Colby discouraged Granato from pursuing Adams's return. Colby also directed another employee away from hiring experienced personnel. 

 Finally, Colby's testimony that he did not consider age in the layoff is not sufficient to defeat summary judgment. At this stage, we must disregard Colby's claim that he used only neutral criteria to select employees for the RIF. On summary judgment, a court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000). See Lipchitz v. Raytheon Co., 434 Mass. 493, 498 (2001); Dartt v. Browning Ferris Indus., Inc. (Mass.), 427 Mass. 1, 16 (1998). See also Bulwer, 473 Mass. at 682 n.8 (judgment notwithstanding verdict and summary judgment standards are same). Adams has created a dispute of fact sufficient to allow a rational jury to find that Colby selected Adams for layoff, and blocked his rehiring, on the basis of age. [Note 26]

 Conclusion. The company makes many persuasive arguments why a jury should render a defense verdict, but it does so by viewing the evidence in the light most favorable to the company. A jury may take the company's explanations for the RIF and the selection of Adams for the RIF at face value, but they are not required to. Adams's proffer at the summary judgment stage was sufficient to raise genuine issues of material fact whether age discrimination motivated the adverse employment action -- a question that a jury and not this court should resolve. The summary judgment in favor of Schneider is reversed and the matter is remanded to the Superior Court for further proceedings consistent with this opinion. [Note 27]

So ordered.

 Page 532 

 MEADE, J. (dissenting, with whom Singh, J., joins). The plaintiff, Mark A. Adams, a former employee of Schneider Electric USA (Schneider), appeals from summary judgment entered in favor of Schneider on his age discrimination claim. See G. L. c. 151B, § 4 (1B). Contrary to the majority's conclusion, Adams's proof was insufficient to permit a reasonable jury to infer that the nondiscriminatory reason articulated for his layoff was pretext. Accordingly, summary judgment was properly allowed, and I therefore dissent. [Note Dissent-1]

 This case is governed in all material respects by Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 39-46 (2005) (clarifying fourth element of prima facie case of discrimination in reduction in force [RIF] context). [Note Dissent-2] Turning to the third and final stage of the analysis, [Note Dissent-3] Schneider persuades me that no reasonable jury could find on this record that Kenneth Colby's articulated reasons for selecting Adams for layoff were a pretext. [Note Dissent-4] See Bulwer v. Mount 

 Page 533 

Auburn Hosp., 473 Mass. 672, 683 (2016), quoting Sullivan, supra at 39 ("burden of persuasion at summary judgment remains with the defendant[], who, 'as the moving part[y], "ha[s] the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, even if [it] would not have the burden on an issue if the case were to go to trial"'"). 

 First, Adams's statistical evidence seems to undermine the theory of his case (i.e., that Schneider did not consider employees over forty "worthy" of retention), and in any event, it fails to meet Adams's production burden on pretext in the third stage. See Sullivan, 444 Mass. at 55 (statistical evidence was of "limited probative value" in third stage, and neither rebutted employer's articulated reasons for laying off plaintiff nor created reasonable inferences of discriminatory animus and causation). The average age of the members of the home and business network in the research and development (HBN R&D) team under Colby's command immediately before the RIF was 48.9; after the RIF, it remained well into the protected age group (47.1), and five employees retained by Colby in this group were over sixty-two. See id. at 49 n.25 (average age dropped by one year). Almost seventy-three percent of the retained team was over forty; and of the thirty-seven employees retained, twelve were older than Adams, and sixteen were fifty or older. Colby even elected to keep his five oldest employees, who were in their sixties. 

 Schneider also established to my satisfaction that the limited, expert opinion of Dr. Craig Moore is unreliable and not probative of age discrimination. See Sullivan, 444 Mass. at 46 n.16 ("The third stage [of the analysis] is the . . . appropriate stage for the employer to establish that the plaintiff's statistical evidence is unreliable or not probative of discrimination because the statistics do not account for factors pertinent to the employer's selection process"). Not only was Dr. Moore not "asked to make any judgments regarding the relevant labor pool," but he also was expressly instructed not to determine "if the employees [were] similarly situated." This omission from his calculus is significant because the comparison of similarly situated employees is the essence of a disparate treatment claim (Adams's sole remaining 

 Page 534 

claim). [Note Dissent-5] Furthermore, Dr. Moore based his analysis on the entire HBN department, even though Colby had the authority to make layoff decisions about only some of these employees. Even if that problem should be overlooked due to Schneider's own identification of the decisional unit, other shortcomings cannot. After acknowledging that an analysis of those in the statutorily-protected category did not produce a statistically significant result, Dr. Moore selected those over age fifty as the protected category to achieve the desired result. To get there, he ignored the statutory definition of the protected class, grouped a number of protected employees (ages forty to forty-nine) with their younger, unprotected counterparts, and treated them as equivalent. According to Schneider's expert, even putting aside this random methodology, the test that produced the significant result was based on those aged fifty-five and over (and not fifty as represented by Dr. Moore); and Dr. Moore's numbers do not back up his reported result. Most problematic for Adams's present purposes, Dr. Moore only considered age as a factor in Adams's discharge. If he had considered other potential factors that might have influenced Colby's selections, such as job function, all statistical significance disappeared. Where Dr. Moore failed to consider or eliminate other possible nondiscriminatory factors for the layoff decisions, which could explain the disparity, his statistical analysis was not probative of discrimination, and it was thus inadequate to meet Adams's production burden on pretext. [Note Dissent-6] See Sullivan, 444 Mass. at 55-56. Nothing in Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382 (2016), which did not involve a challenge to an expert opinion, changes the result. See id. at 401-402 & n.31 (despite small sample size, plaintiff could rely on statistics to show firm's failure to retain women in her section; nondiscriminatory explanations for women leaving firm presented jury question). 

 Adams also claims that he met his burden pertaining to pretext by producing twenty-five documents demonstrating that Schneider considered age as a "negative factor[,] evidencing a plan to push out older workers to make room for younger [employees]." I disagree. 

 Page 535 

 The statements, remarks, and phrases in these documents, culled from over 9,000 pages of discovery materials, are remote in time, are made by employees outside of HBN R&D or by nondecision makers, are ambiguous as to age-based animus, or are unrelated to the January 2017 RIF decisional process. Many are taken completely out of context. Accordingly, they do not qualify as direct evidence of discrimination, and they are not probative of pretext. See Somers v. Converged Access, Inc., 454 Mass. 582, 597 (2009); Sullivan, 444 Mass. at 49 n.24 (ageist statements made by decision maker to another discharged employee did not permit inference that plaintiff was terminated because of her age); Wynn & Wynn, P.C. v. Massachusetts Comm'n Against Discrimination, 431 Mass. 655, 667 (2000) ("Stray remarks in the workplace, statements by people without the power to make employment decisions, and statements made by decision makers unrelated to the decisional process itself" are not "direct or strong evidence that proscribed criteria played a motivating part in an employment decision"). Colby, the putative decision maker, was questioned extensively at his deposition about the statements in these documents. Colby testified that he had no knowledge of, nor did he recall, most of them. Moreover, almost all of the documents postdated the January 2017 RIF. In fact, some of the would-be "smoking gun" documents were authored by Bin Lu, who was not yet employed by Schneider at the time Colby made the decisions. Thus, any statements in these documents could not have had a material "impact" on Colby's decision-making. 

 Although the majority concludes that a jury would be free to summarily disbelieve Colby's testimony that he was the sole decision maker, Adams produced no proof from which a reasonable jury could find that there were other decision makers who harbored discriminatory animus involved in Adams's layoff. [Note Dissent-7] A 

 Page 536 

potential disbelief in Colby's testimony is not a "specific fact" for purposes of Mass. R. Civ. P. 56, 365 Mass. 824 (1974). See Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Cf. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (without offering any concrete evidence from which reasonable juror could return verdict in plaintiff's favor, plaintiff could not defeat summary judgment by merely asserting that the jury could disbelieve the defendant's denial of wrongdoing); Mass. R. Civ. P. 56 (e) (response of party opposing summary judgment motion must "set forth specific facts showing that there is a genuine issue for trial"). 

 To the extent that Adams maintains that individuals involved in human resources (HR), Michelle Gautreau and Amanda Arria, were the real decision makers here, the claim is not supported by the record. [Note Dissent-8] Colby testified in detail about his decisional process as he pondered his selections for the layoff list. That process included first terminating all the contractors working in HBN R&D; then creating a spreadsheet to organize the data and to rank the employees for possible termination, identifying experts in areas "100% tied to a key project" and removing them from consideration; and finally grouping employees by function to compare them to retain the most critical. [Note Dissent-9] Colby expressly testified that no one either directed him in his choices or instructed him to select Adams; that he neither factored in age, nor was told to do so; [Note Dissent-10] and that he picked Adams for layoff because Adams 

 Page 537 

spent most of his time working for other subdivisions, such that his loss would have less of an impact on projects for which Colby was responsible. As is true at any corporation, Schneider's HR department assists and supports business leaders with employment decisions, but has no authority to make independent personnel decisions. Arria had to sign off on the final selections, but Adams has produced no evidence that she participated in the selection process.

 Pankaj Sharma, the senior vice-president of HBN, was in a position to influence Colby's decision-making. However, Colby claimed he made his decisions alone, and he denied meeting with Sharma until after he made his independent selections. Sharma worked in Singapore, while Colby worked in Massachusetts, and thus, chance encounters were unlikely. Adams also did not produce any countervailing proof of any interactions or conversations between Colby and Sharma from which improper manipulation or influence by Sharma could be inferred. [Note Dissent-11] Cf. Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55 (1st Cir. 2000) (denying summary judgment for employer where general manager who made discriminatory comments held "almost daily conference calls" with decision maker and was asked for opinion about plaintiff's dismissal, and there was evidence that general manager was involved in decision). Adams also produced no evidence that any other senior leader attempted to manipulate or influence Colby's decisions. Kabai, Colby's peer, knew about the layoff ahead of time and did not try to convince Colby to take Adams off the list. The company's upper management, including Sharma's boss, David Johnson, the executive 

 Page 538 

vice-president of the information technology division (ITD) globally, and Jean Pascal-Tricoire, Schneider's chief executive officer, are mentioned only in passing in the record. [Note Dissent-12] In fact, there was no evidence that they were involved in any way in the RIFs. As noted above, Lu, whose discriminatory statements are relied on in abundance, was not even at the company at the time of Adams's layoff. Nor is there any evidence of record that Colby relied on either "information [provided by others] that [was] inaccurate, misleading, or incomplete," Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 83 (1st Cir. 2004), or the recommendation of any superior "whose motives have been impugned" (citation omitted). Bulwer, 473 Mass. at 688. In sum, Adams's proof is insufficient to support his theory that Colby acted as an innocent pawn, or the "cat," of senior management. See Brandt v. Fitzpatrick, 957 F.3d 67, 79 (1st Cir. 2020) ("an employer can be held liable when a decision-making official . . . relies on false 'information that is manipulated by another employee who harbors illegitimate animus' to take an adverse employment action" [citation omitted]). See also Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2350 (2021) ("A 'cat's paw' is a 'dupe' who is 'used by another to accomplish his purposes'" [citation omitted]). 

 Furthermore, a fact finder would not be permitted to find, as the majority maintains, that Colby was in cahoots with "upper management" to shed older employees and replace them with younger talent. Indeed, Adams admitted that Colby took steps to prevent having to terminate his employment. Adams admitted that Colby twice approached Kabai to determine whether Kabai could place Adams on his team in field quality engineering, Adams's preferred work department. [Note Dissent-13] Given these admissions, I am satisfied that no reasonable jury could find that a month or two after trying to 

 Page 539 

place Adams with Kabai, Colby then would turn around and intentionally fail to inform Christopher Granato in advance that Adams would be part of the RIF, and thereafter "thwarted" Granato's attempts to bring back Adams. A finding that Colby, who kept his five oldest employees in January 2017, took these actions in order to reduce the number of older workers requires an even bigger, unwarranted stretch of logic. Moreover, after the RIF, Colby did not fill Adams's position in HBN R&D with another employee, and his position was not backfilled. Adams's extra-department, battery initiative work was distributed to Fred Rodenhiser, Adams's former manager, as well as to two employees of unknown ages hired in the Philippines to work with the large team assembled there, which was already performing this type of work. [Note Dissent-14] 

 Adams next claims that Schneider's alleged budgetary problems that triggered both the 2016 and 2017 RIFs, and his termination, were a pretext. The factual basis for this argument is not supported by the record. There was substantial evidence of the need for cost cutting, and unrebutted testimony that layoffs in HBN R&D were necessary to reach the budget goals. Colby's subsequent hiring of a few recent graduates with specialized skills, using funding made available by a couple of resignations, would not permit a reasonable jury to find that the budgetary reasons were a pretext. 

 It is true that the documents show that the age and, to a lesser extent, the gender of Schneider's workforce were frequently discussed and analyzed by management. [Note Dissent-15] Schneider admitted that it had what are variously referred to as "age diversity" or "diversity" policies. [Note Dissent-16] Given the reality of labor demographics and the lack of diversity at Schneider, the talk of age and gender 

 Page 540 

was hardly surprising. [Note Dissent-17] During this time period, Schneider, like many science, technology, engineering, and math companies, found itself with an aging, male work force. Adams, along with Colby and other members of HBN R&D, had worked together dating back to the 1990s at the American Power Conversion Corporation, a company acquired by Schneider in 2007. When the challenged RIF commenced, many of the employees in the HBN R&D department were at, or approaching, retirement age. These employees possessed a wealth of valuable knowledge and information gained from years of experience. If Schneider failed to bring in new employees to transfer knowledge, it risked losing it forever, as its employees retired. Succession planning for "junior talent" and the next generation of workers was not only important for the viability of HBN R&D, but also critical. The alleged "realities of the modern workplace" are not a substitute for proof of pretext. In short, the diversity policies and succession planning reflected in these documents were consistent with legitimate business objectives and, standing alone, do not permit an inference of pretext. 

 It is true that terminating employees over the age of forty in order to clear the decks for young talent would constitute age discrimination. However, no reasonable jury could find that that is what transpired here. Even if the documents evince discriminatory animus, and a corporate strategy to create space for young workers, there is insufficient evidence that any such nefarious plan was actually implemented in January 2017, or any time thereafter. The HBN R&D department headed by Colby was old 

 Page 541 

before the RIFs in April and May 2016 and January 2017. It remained old at the end of the RIFs. The early retirement and broader ITD-wide college recruiting programs proposed by HR to bring in "fresh talent" never materialized. Long after the three layoffs, these older employees continued to draw their higher salaries, and the number of employees in HBN R&D remained static. In fact, in January 2018, the latest date for which statistics are available, the demographics of HBN R&D looked the same as they did right after the January 2017 layoff: thirty-six employees, twenty-six of whom were over forty (sixteen were over fifty, and only five employees were under thirty). 

 As Adams points out, despite the over-all hiring freeze, exceptions were made, and Schneider continued to recruit from specific colleges and universities in 2016 and 2017. The hiring process can take months and years, and the talent pool is limited. An employer should be able to continue established recruitment programs without running afoul of the antidiscrimination laws. Moreover, although Colby engaged in college recruiting in 2017, there is not a shred of evidence that Colby hired younger workers in the space opened by the RIFs. [Note Dissent-18] In the years following Adams's termination, the only two hires Colby made filled positions opened when two employees resigned to take positions at other companies. The majority recognizes this hole in Adams's case; its suggestion that simply clearing out the older workers and "set[ting] the foundation for its plan . . . would be sufficient discriminatory animus" for liability rings hollow. Ante at 529. Liability under G. L. c. 151B requires more than discriminatory animus. 

 The context of the January 2017 layoff here is very unusual for a discrimination case: Adams not only knew the putative decision maker, but he was also long-term friends with him. As Adams admitted, Colby harbored no discriminatory animus against him. He also does not challenge the "con" attributed to him by Colby that led to his layoff: he admittedly wanted little or nothing to do with the work of HBN R&D, making him an obvious choice for the layoff list. Because Adams's proof was insufficient to permit a reasonable jury to infer that the nondiscriminatory reason articulated for his layoff was a pretext, summary judgment was properly allowed.

FOOTNOTES
[Note 1] This case initially was heard by a panel comprised of Justices Meade, Henry, and Singh. After circulation of a majority and dissenting opinion to the other justices of the Appeals Court, the panel was expanded to include Chief Justice Green and Justice Rubin. See Sciaba Constr. Co. v. Boston, 35 Mass. App. Ct. 181, 181 n.2 (1993). 

[Note 2] Prior to the summary judgment, Adams dismissed his claims against individual defendants Mirza Akmal Beg and Michelle Gautreau. On appeal, Adams proceeds solely on count one of his first amended complaint ("age discrimination based upon disparate treatment") against Schneider. He has waived all other claims, including his claims against the remaining individual defendant, Amanda Arria. 

[Note 3] Other subdivisions of HBN included medium, product marketing, channel, field quality engineering, and global supply chain. The various subdivisions of HBN collaborated on certain topics. HBN itself was organized under the information technology division. 

[Note 4] The company referred to the Andover campus interchangeably as "Boston" or "the Boston campus." 

[Note 5] Schneider needed to make all of its products conform to new environmental standards for the European market by June 2017. 

[Note 6] Shortly after the January 2017 RIF, Arria was promoted to become vice-president of global HR for the company. 

[Note 7] On several occasions before Colby became director, Sharma and Colby had discussed that the business "had been flat or negative for a number of years." The major part of Colby's budget was the salaries of his forty-five member team. Sharma, in consultation with the finance team, subsequently decreased the target number. 

[Note 8] It is possible there were thirty-nine employees; Colby was not sure whether one position reported to him. 

[Note 9] The dissent concludes that Colby did approach Kabai but, again, the jury are not required to believe this. In any event, Kabai approached his manager, who was Sharma, to confirm there was no headcount in that group to retain Adams. 

[Note 10] Adams and Colby were longtime friends. At various times, Adams had reported to Colby, Beg, and another manager, Fred Rodenhiser. 

[Note 11] As required by Federal antidiscrimination law, the company provided Adams with the job titles and ages of all employees discharged as part of the RIF as well as those retained. 

[Note 12] The company offered evidence that the goal was to recruit recent college graduates to obtain specific skill sets. However, as explained in the discussion infra, a jury need not believe this evidence, and so we disregard it on summary judgment. The company offered no evidence that only recent college graduates would have the desired skill sets, or that the older workers lacked them. The company performed a skill set review of workers under forty. No such review was done of older workers. 

[Note 13] Our review is somewhat hindered by the fact that Adams's counsel at deposition referred to documents by exhibit number without ever indicating the corresponding document control number and in some cases without including the document in the record. For example, the record includes the testimony of numerous witnesses about a document that referred to "[d]eeper cuts for college grads," but that document is not included in the record. Without context, that document could mean polar opposite things -- that the company was making deeper cuts in college hiring or that it was making deeper cuts of current employees to be able to hire college graduates. In the summary judgment context, we must interpret the document in the light most favorable to Adams. 

[Note 14] The company also referred to Boston's older workers as "[h]igh R&D labor cost." The United States Supreme Court has signaled that employment decisions based on expense from years of service are not discrimination based on age. See Hazen Paper Co. v. Biggins, 507 U.S. 604, 610-613 (1993). The Supreme Judicial Court has not indicated whether it agrees. This could be significant in a case like this where a department leader is required to reduce the department's budget by a certain dollar amount. The mathematical reality is that one can terminate a fewer number of more expensive workers, who tend to be older workers, to leave a larger retained workforce to complete the work. 

[Note 15] All quotations from documents in the record appendix are as they were written, including symbols, without correction or comment on grammar. Any emphasis is in the original unless otherwise indicated. We do not include shading. 

[Note 16] Arria continued, "I have some ideas about us potentially offering an early retirement program this summer. If we could secure some restructure funds to offer this, we could potentially encourage a few employees to retire and make some budget reductions/room to hire in some of the college talent we have been discussing. There are some legal cautions we would need to take to run a program like this, but if we are careful with our wording and execution we can pull this off effectively in a way that our employees would feel like it was a benefit to them, and benefit the R&D organization as well." 

[Note 17] Also in July 2017, Arria sent an e-mail message to Sharma, Lu, and Rougnon, stating that there was "a pool of about 7 employees in BOC that are of retirement age, and we expect about 3-4 to volunteer if we offer this [early retirement option]. These position will be replaced but with new." 

[Note 18] Because the case law sets forth a multipart test that includes a three-stage paradigm, the first stage of which includes another multipart test, and some of the parts of the two multipart tests are the same, we label the first test with numbers, identify each stage of the paradigm by "first," "second," or "third," and label the subtest of the first stage of the paradigm with letters. And because the standard draws from several cases, often nesting quotes within quotes and using square brackets to tailor the quotes to a particular case, we omit the internal case citations and brackets in favor of case citation(s) for each paragraph. The general framework can be found in Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 680-683 (2016). 

[Note 19] "Because employees rarely can produce direct evidence of discriminatory animus and causation, see Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 38 (2005), they may survive a motion for summary judgment by producing 'indirect or circumstantial evidence [of these elements] using the familiar three-stage, burden-shifting paradigm first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973) (McDonnell Douglas).'" Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 396 (2016), quoting Sullivan, supra at 39-40. 

[Note 20] In this way, Massachusetts has departed from McDonnell Douglas, 411 U.S. at 802-805. Any shorthand references in our cases to our continuing to apply the McDonnell Douglas framework are not, strictly speaking, accurate because they mask that the Supreme Judicial Court has departed from that standard in certain subtle but important respects. In our cases, this shorthand means a modified or pretext only McDonnell Douglas framework. Our decisions do not require that the plaintiff prove that a reason given by the employer for the adverse decision was both false and given to cover a discriminatory animus. See Bulwer, 473 Mass. at 681-682, citing Lipchitz v. Raytheon Co., 434 Mass. 493, 500-501 (2001). In this way, we depart from the Federal analysis under Title VII, which requires a plaintiff to demonstrate that the employer's stated reasons are a pretext for concealing a discriminatory purpose. In employment law vernacular, the Title VII analysis is "pretext plus." Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 442-443 (1995). 

[Note 21] Six of the seven employees terminated in the April 2016 RIF were over forty, and five were over fifty; and all nine employees terminated in May 2016 were forty-eight or older. All employees discharged as part of the January 2017 RIF were in the protected age category. These three RIFs conducted over a short period of time raised an inference that Schneider was targeting older employees for layoff. See Sullivan, 444 Mass. at 46 n.16, quoting Smith College v. Massachusetts Comm'n Against Discrimination, 376 Mass. 221, 228 n.9 (1978) ("In a proper case, gross statistical disparities alone may constitute prima facie proof of a practice of discrimination"). 

[Note 22] Nothing in this decision should be taken as disapproval of succession planning. 

[Note 23] The United States Supreme Court also has endorsed the notion of a tainted decision that infects the decision-making process, even where the ultimate decision maker is unaware of the taint, describing it as a "'cat's paw' case." Staub v. Proctor Hosp., 562 U.S. 411, 415-416 (2011). Staub explained this theory: "The term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Judge Posner in 1990. See Shager v. Upjohn Co., 913 F.2d 398, 405 [(7th Cir. 1990)]. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing. A coda to the fable (relevant only marginally, if at all, to employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward." Staub, supra at 416 n.1. While the Supreme Judicial Court has not used the memorable feline label, the analogy is apt. 

[Note 24] The net result of the January 2017 RIF was to increase the percentage of the department that was under forty by about twenty-eight percent. This is because, even though the absolute number of people under forty remained the same, the relative number increased because only those over forty were terminated. 

[Note 25] Finney, 42 Mass. App. Ct. at 51, addresses the employee's prima facie case, but the reason applies equally to the third-stage pretext analysis. 

[Note 26] This analysis assumes that Colby was the sole decision maker, but a finder of fact could conclude otherwise. Indeed, when others approached Sharma about retaining the very productive Adams, Sharma said no, and it is a reasonable inference that he knew Granato had some room in his budget to do so. 

[Note 27] Adams's request for attorney's fees pursuant to G. L. c. 151B, § 9, is denied without prejudice. The request is premature, as that statute allows fees to a prevailing party. 

[Note Dissent-1] I note that our review was significantly hampered by the parties' noncompliance with the letter and spirit of rule 9A(b)(5) of the Rules of the Superior Court (2018). See Dziamba v. Warner & Stackpole LLP, 56 Mass. App. Ct. 397, 399 (2002) (describing "anti-ferreting" purpose of "rule designed to assist a trial judge in the all-too typical situation in which the parties throw a foot-high mass of undifferentiated material at the judge"). 

[Note Dissent-2] It is undisputed that Adams was discharged as part of an RIF. See Sullivan, 444 Mass. at 35 n.3. 

[Note Dissent-3] The majority concedes that Schneider met its burden at the second stage of the test, i.e., that it demonstrated a nondiscriminatory reason for termination. 

[Note Dissent-4] I disagree with the majority's and Adams's understanding of the summary judgment procedure. In determining whether a genuine issue of material fact exists on this record, a reviewing court is not required to disregard all evidence favorable to Schneider, including Colby's unimpeached deposition testimony and the documentary evidence produced from the time of the January 2017 RIF. If that were the rule, summary judgment would rarely, if ever, be available to a defendant. See Barron Chiropractic & Rehabilitation, P.C. v. Norfolk & Dedham Group, 469 Mass. 800, 804 (2014). See also O'Rourke v. Hunter, 446 Mass. 814, 821-822 (2006); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991) (establishing summary judgment standard and burdens of moving and nonmoving parties); Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974) ("an adverse party may not rest upon the mere allegations or denials of his pleading"). The fact that Schneider bears the burden of persuasion at the third stage of the order of proof does not obviate Adams's burden of producing evidence of pretext. See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 683 (2016). To the extent that Adams and the majority rely on Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000), to strengthen their claim of error in the summary judgment procedure, the Supreme Judicial Court has not adopted the principles of that case. Moreover, the United States Court of Appeals for the First Circuit has rejected a reading of Reeves that would preclude summary judgment where, as here, the moving party relies on the testimony of interested witnesses. See LaFrenier v. Kinirey, 550 F.3d 166, 168 (1st Cir. 2008), and cases cited. 

[Note Dissent-5] Dr. Moore admitted as much, earlier in his report, acknowledging that "[a]n analysis should be conducted on a population of employees that were reasonably similarly situated at the time of the personnel action." 

[Note Dissent-6] Dr. Moore prepared his report before Colby was deposed. Adams had plenty of time to obtain an updated statistical report from Dr. Moore, comporting with Sullivan's teachings, but chose not to do so. 

[Note Dissent-7] To the extent that the majority takes issue with the "stray remarks" doctrine, it is firmly embedded in Massachusetts law; it should be for the Supreme Judicial Court, not this court, to retire it. See, e.g., Sullivan, 444 Mass. at 49 n.24; Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 447 (1995); Fontaine v. Ebtec Corp., 415 Mass. 309, 314 n.7 (1993); Charles v. Leo, 96 Mass. App. Ct. 326, 339-340 (2019); Brownlie v. Kanzaki Specialty Papers, Inc., 44 Mass. App. Ct. 408, 414 (1998); Finney v. Madico, Inc., 42 Mass. App. Ct. 46, 50-51 (1997); Tardanico v. Aetna Life & Cas. Co., 41 Mass. App. Ct. 443, 450 (1996). See also Zampierollo-Rheinfeldt v. Ingersoll-Rand de Puerto Rico, Inc., 999 F.3d 37, 52 (1st Cir. 2021); Murray v. Warren Pumps, LLC, 821 F.3d 77, 87 (1st Cir. 2016). 

[Note Dissent-8] Adams explained that Gautreau, the director of HR, made the decision after clearing it with Arria, the vice-president of HR, "[b]ecause that's how the chain of command works at every company." HR also sent Adams the termination letter. 

[Note Dissent-9] Colby prepared a spreadsheet listing factors such as "pros," "cons," "impact," and salaries. Under Adams's "cons," Colby wrote, among other things, that he "does not care for standard [R&D] work." According to Colby, Adams "really enjoyed" field quality work but did not enjoy the work assigned to him for the restricted other hazardous substances project, which accounted for twenty-five percent of his time. 

[Note Dissent-10] Asked whether he ever became aware that the senior leadership of the Boston One Campus was concerned about the age of the employees, Colby responded, "No, not the age. They [were] not concerned about the age. . . . [W]e wanted to make sure we had a good succession plan, because we have a lot of very knowledgeable experienced people. . . . [S]ome of them were getting close to retirement, and we wanted to make sure that we had people that they could transfer the knowledge to." Colby denied being asked to give hiring preference to younger individuals. However, Colby did admit that after Lu joined the company, which was after the January 2017 RIF, management was trying to expand HBN R&D employees' knowledge with some new emerging technologies. To that end, he was asked to look for engineers from the top graduate programs who possessed these specific skill sets. While Schneider recruited globally at many schools, because of HBN's small size and limited positions, HBN partnered with only one, Virginia Tech University, a graduate level program, which would have students of all ages. To the extent that Adams argues that Schneider exhibited stereotypical thinking by hiring early career employees, instead of training its older workers, the unrebutted evidence demonstrates that Schneider sent its employees to Virginia Tech University's laboratories to be trained on cutting edge technology skills. 

[Note Dissent-11] The evidence of record was that Colby met with Arria, Sharma, and others to go over his final selections; Sharma and Arria signed off on his recommendations. The majority's statement that the wishes of senior management (to get rid of the older employees) were expressed in these meetings is not a fair inference, but rather is mere speculation. Adams presented no evidence that Sharma and Arria were the "architects" of any master plan. 

[Note Dissent-12] Either Sharma was not deposed, or his testimony is not included in the summary judgment record. 

[Note Dissent-13] In fact, several individuals, including Colby, approached Kabai to inquire about Adams transferring to field quality engineering; Kabai investigated, but was unable to accommodate Adams due to budget constraints. Christopher Granato, who first learned of Adams's layoff upon a return from a business trip in February 2017, had funds available for a temporary contractor position, and was interested in bringing back Adams. These facts are summarily ignored by the majority based on its conclusion that a jury would not be required to credit them. See ante at note 9. Again, a potential for juror disbelief is not a substitute for proof that there were other decision makers who harbored discriminatory animus in effectuating Adams's layoff. 

[Note Dissent-14] Rodenheiser testified that he took over part of Adams's work, and the rest was either "spread throughout the company," or was "not getting done." 

[Note Dissent-15] For example, in an October 28, 2015, e-mail message, ITD vice-president Colin Campbell expressed a need for "age diversity" in the Boston office. Campbell also stated that the leader of the "embedded system team" recognized the issue "and has been stocking his team with young talent." In an e-mail message of the same date, an internal recruiter stated, "[T]here is no down side to hiring a qualified young engineer." In an e-mail message dated March 23, 2016, Arria wrote that she had "sent a love note off last night asking if we can continue college hiring . . . would hate for us to stop this, especially as a female diversity feeder group stay tuned . . . ." As Adams notes, there are many more similar statements. 

[Note Dissent-16] In his April 20, 2017 presentation, Jiri Cermak, senior vice-president of HR for ITD, expressed Schneider's goal to "[d]evelop diversity (gender, nationalities, but not only . . . 'get the knowledge of the world'"). Colby testified that "the technical world" had a "disproportionate number of males compared to females . . . and so [they] really push[ed] to try to hire, whenever possible, talented females." Arria further indicated that both as a global company and within HBN, they worked "really hard" to achieve a diverse workforce, "whether that's age, gender, ethnicity, skills, [or] location." They did so because research shows that diverse teams are more high performing and provide a competitive advantage. I note that Schneider's diversity initiative furthered the underlying purposes of G. L. c. 151B. 

[Note Dissent-17] Schneider was encountering difficulties hiring qualified female candidates. In an e-mail message dated August 28, 2017, to William Manning, an HBN vice-president, Sharma expressed dissatisfaction with a male candidate he had interviewed, and Sharma asked whether they could "look at more candidates, younger, women." In response, Manning indicated that although he had encouraged recruiters to give diversity (which he defined as "younger, women") "priority" for a certain position, no female candidates with the necessary experience had applied. 

[Note Dissent-18] The ambiguous "[d]eeper cuts for college grads" statement referenced by the majority, ante at note 13, was explained by its author, Gautreau, to mean "[p]robably reduce what we're doing in terms of college recruiting." 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.