NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13352

MARK A. ADAMS  vs.  SCHNEIDER ELECTRIC USA.


Middlesex.     March 8, 2023. - June 21, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt, & Georges, JJ.


Anti-Discrimination Law, Age, Termination of employment, Prima facie case, Burden of proof. Employment, Discrimination, Termination. Practice, Civil, Summary judgment, Burden of proof.



Civil action commenced in the Superior Court Department on October 11, 2017.

The case was heard by William M. White, Jr., J., on a motion for summary judgment.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.


Robert S. Mantell (Ilir Kavaja & Paul L. Nevins also present) for the plaintiff.
Dawn Reddy Solowey (Christopher W. Kelleher also present) for the defendant.
Monica R. Shah, Lucie Gulino, & Michaela C. May, for Massachusetts Employment Lawyers Association & others, amici curiae, submitted a brief.

KAFKER, J.  Mark Adams sued his former employer, Schneider Electric USA (Schneider Electric), for age discrimination after he was laid off in a 2017 reduction in force.  Schneider Electric was granted summary judgment by the Superior Court, and the Appeals Court, in a divided decision, reversed.  We granted further appellate review to clarify the summary judgment standards in employment discrimination cases, including the correct application of the "cat's paw" theory of liability and the "stray remarks" doctrine.

Adams was fifty-four years old at the time of the layoff.  He had been an electrical engineer in the research and development (R&D) group of the home and business networks (HBN) division of the company in Andover since 2007, when Schneider Electric acquired his previous employer.

Adams produced evidence that officials at Schneider Electric wanted to increase "age diversity" in the company in general, and the HBN R&D group in particular, by hiring recent college graduates and reducing the number of older employees.  Consistent with this policy, Adams's R&D group in Andover was targeted for reductions in force while a younger R&D group in India was not.  Human resources (HR) executives also stressed the need for age diversity and referenced making budget reductions to make room for such diversity.  After Adams was laid off, his name appeared on a list exemplifying this policy.

Finally, statistical evidence, albeit contested, demonstrated that the layoffs had a disparate impact on those over fifty years of age.

HBN R&D's director of engineering in Andover, Kenneth Colby, who had selected employees for the reduction in force, denied knowledge of any such personnel policy and claimed that he did not use employees' ages to determine whom to lay off. He explained that his primary criterion was who would have the least impact on the group's work. Thus, he claimed, Adams was selected because much of his time was spent working for other Schneider Electric divisions.

The motion judge granted summary judgment to Schneider Electric. The judge determined that Adams could not show that Colby's stated justification for his termination was pretextual, because Colby acted alone in selecting employees for the reduction in force, and all comments suggesting age discrimination came from other officials at Schneider Electric. The Appeals Court reversed. Adams v. Schneider Elec. USA, 101 Mass. App. Ct. 516, 531 (2022). It determined that there were two bases on which Adams could show pretext. First, he could show that Colby was an "innocent pawn" of a discriminatory corporate strategy, or second, he could show that Colby himself acted with age-based animus and that his description of his process was false. Id. at 528-529. The Appeals Court further

stated that Colby's claim that he did not consider age must be disregarded at this stage, because "[o]n summary judgment, a court 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'"  Id. at 531, quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000).

We conclude that the grant of summary judgment was improper.  It is possible, and consistent with liability under the employment discrimination statute, for a mid-level manager directed to lay off employees in his or her division to be found to further a discriminatory corporate policy without knowingly doing so.  See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 688 (2016).  This is an example of the so-called cat's paw or innocent pawn theory of liability.  There was also sufficient evidence, and not just stray comments by those outside of the decision-making process, to create a genuine issue of material fact whether Schneider Electric had such a corporate policy to replace older employees with younger recent college graduates. Multiple corporate executives, including those involved in the layoffs, made remarks to this effect.  In addition, there is sufficient evidence in the summary judgment record to dispute whether Colby did not in fact consider age.  He met with representatives from HR during the selection process who gave him information on the ages of employees, and he was aware of

the desire to improve HBN R&D's age diversity, at least in the period shortly after the layoffs. In fact, he participated in college recruiting trips in 2017 and dissuaded a subordinate manager from hiring more experienced engineers.

Finally, although we reach the same conclusion as the Appeals Court, we nonetheless emphasize that the Appeals Court's statement that on summary judgment courts are required to disregard all testimony of a moving party that a jury is not required to believe was an incorrect, or at least incomplete, statement of summary judgment law. On summary judgment, courts must determine whether the undisputed facts entitle the movant to judgment as a matter of law. See Le Fort Enters., Inc. v. Lantern 18, LLC, 491 Mass. 144, 148-149 (2023) (Le Fort). As the dissent in the Appeals Court noted, "potential disbelief in Colby's testimony" alone does not a dispute of fact make. Adams, 101 Mass. App. Ct. at 535-536 (Meade, J., dissenting). Rather, Adams must point to specific material in the record that could lead a jury to doubt Colby's credibility -- a burden of production that Adams has satisfied here.[1]

---

[1] We acknowledge the amicus brief submitted by the Massachusetts Employment Lawyers Association, Fair Employment Project, Inc., and Lawyers for Civil Rights.

1.  Background.  We summarize the evidence in the summary judgment record in the light most favorable to Adams, the nonmoving party.  See Le Fort, 491 Mass. at 149.

a.  Corporate age diversity goals.  Schneider Electric appeared to have a corporate strategy of hiring younger employees and reducing the number of older employees to improve "age diversity" at the company.  Significant evidence in this regard is associated with Amanda Arria, the global vice-president of HR with responsibility for HBN at the time of the relevant events.  As she described her job, "I am responsible for partnering with the leadership team to ensure we have the right people strategies in place for . . . business success."

In a 2015 e-mail message regarding a potential new hire, the then-head of HBN R&D globally said to Arria:  "Business Power team [which contained the HBN R&D group] in Andover needs age diversity.  The embedded system team leader recognizes this and has been stocking his team with young talent.  I'd like to encourage this more."  Subsequently, the company appeared to do just that.

Schneider Electric implemented a hiring freeze in 2016 (still in effect during the litigation).  It conducted reductions in force in April and May of 2016, in addition to the one in 2017 in which Adams was terminated.  In the April layoff, six of the seven terminated employees were over forty, and five

were over fifty.  In May, all nine were forty-eight or older, and six of the nine were over fifty.  In the January 2017 layoff, discussed more infra, all eight terminated employees (including Adams) were over fifty.  Despite the hiring freeze and these layoffs, Schneider Electric continued its ongoing recruiting program to hire recent college graduates.  Arria explained in a deposition that this was because recent graduates "brought fresh skills," not because they were younger, but she also said that the company was attempting to achieve a "diverse workforce" through hiring, "whether that's age" or other employee attributes.

In addition, in a 2016 HR presentation, Arria indicated that one of HBN's goals was to improve "age/gender demographics," and a recent achievement, perhaps relating to that goal, was the April 2016 reduction in force.  A recruitment policy from 2016 stated:  "The maximum employment age with Schneider Electric is 58 or 60 years as per the respective legal entity guidelines."[2]

b.  Budget reductions.  Around October 2016, leadership at Schneider Electric determined that they needed to make further budget reductions in the HBN division:  there was, as Arria termed it, a "cost take-out challenge globally."  Arria

---

[2] No such legal entity guidelines appear in the record.

explained that Pankaj Sharma, the senior vice-president of engineering, made the decision to reduce costs and "gave cost take-out targets to each of his leaders" in the groups he oversaw.

In December 2016, Sharma told Colby that he would need to cut his group's budget by twenty-two percent. Colby inferred from this that he would need to reduce headcount, as labor costs were the majority of the budget. Arria confirmed: "it was understood that, yes, we had to make some cuts in personnel costs." In contrast, the HBN R&D group in Bangalore, India, was given a budget reduction target that did not require layoffs. Their lower target could instead be met by eliminating "travel, supplies and things like that." The employees in India were younger than those in Andover: the majority were in their thirties, whereas in Andover, the majority were over fifty.

Also in December 2016, Arria met with Michelle Gautreau, an HR director working under her, to discuss the budget reductions. Gautreau's handwritten notes from the meeting included the line "deeper cuts for college grads." It is not clear whether that meant that the college recruiting program would be curtailed as part of the budget reductions (as Gautreau explained in her deposition), or that the layoffs they were discussing were being done to make room in the budget to hire recent college graduates.

In any case, after Sharma gave him his marching orders, Colby set out to determine whom to cut. He stated that based on advice from his supervisor, Jim Munley, he selected employees for the reduction in force by looking at (1) which employees were working outside his division; (2) whose termination would have the least impact on the division's goals; and (3) whether management roles could be consolidated. Colby stated that age was not a factor and that he was not aware that company leadership was concerned with the age of employees or that there was a policy of regularly laying off older employees to create space for young talent.

According to Colby, he alone made the initial decisions about whom to lay off, although he exchanged a few drafts of his list with HR. Gautreau stated that she discussed the layoffs with Colby, provided advice, and gave him a list of employee details that included their ages, saying, "It's just one tool that will help you make the decision." Colby cleared the final list with a small group of executives and HR personnel, including Sharma, Munley, Gautreau, and Arria. Sharma asked for one employee, a recently widowed sixty-six year old, to be excluded from the layoff. Ultimately, seven employees who reported directly to Colby were laid off, all of whom were over fifty, out of forty-three in the R&D group supervised by Colby and seventy-four total in the HBN division in Andover.

Colby explained in his deposition that Adams was included on the layoff list because he did not spend much time on the division's projects: "the majority of his time was spent doing work, very good work, but for another division, field quality and global supply chain. . . . [B]y selecting Mark, along with other individuals, it had less of an impact on the projects that I was responsible for." Colby had worked with Adams since 1998, and he considered Adams "extremely hard working," "a great problem solver," and "a very good friend"; in Adams's deposition, Adams stated that he did not believe that Colby bore discriminatory animus toward him. Colby suggested transferring Adams to the field quality division, but that team lacked the budget. Adams was notified by telephone of his layoff on January 27, 2017, sometime after the other employees were laid off, as he had been traveling on company business.

Colby apparently did not suggest transferring Adams to global supply chain, the other division for which he had been working at Schneider Electric. Christopher Granato, the vice-president of that division, was not informed in advance about the layoff. About one month after Adams was laid off, Granato asked Colby about potentially hiring Adams as a contractor. Colby discouraged Granato from doing so, explaining that "HR may not want that to happen for a couple reasons." Granato replaced

Adams with part-time work from a field quality division employee and by hiring two new employees in the Philippines.

The parties introduced dueling statistical evidence regarding whether the layoffs had a disparate impact on older employees. The plaintiff's expert stated that "there was a clear indication of age bias in the selection of those laid off by Schneider [Electric]," determining that there was a disparate impact on employees who were fifty and older. Schneider Electric's expert identified several deficiencies in the plaintiff's expert's analysis: the plaintiff's expert compared the laid off employees to the entire division, rather than only those who reported directly to Colby, and he did not control for job function, which Colby testified had factored into the selection criteria. The defendant's expert found that employees over forty were not selected for terminations at higher-than-expected rates. While he also found, like the plaintiff's expert, that employees over fifty were terminated at higher rates when not controlling for job function, he explained that this finding was highly sensitive to minor tweaks to the data, which "casts doubt on whether the data allows for reliable and robust statistical findings." The defendant's expert also pointed out that the average age of employees declined only slightly after the reduction in force (from 48.9 to 47.1) and

that the five oldest employees were retained, casting doubt on Adams's age discrimination theory.

c. Post-layoff evidence. Evidence from after Adams was laid off also supported his claim that his layoff had been part of a discriminatory policy. Jiri Cermak, Arria's boss and the senior vice-president of HR, suggested in several presentations that the company needed to hire "[m]ore early career talents," although they might "need to create the space" to do so through "restructuring" or "[w]orkforce planning." In an e-mail message to the head of HBN R&D globally, Arria suggested that to solve the "age demographic challenges" the division faced in Andover,

> "we could potentially encourage a few employees to retire and make some budget reductions/room to hire in some of the college talent we have been discussing. There are some legal cautions we would need to take to run a program like this, but if we are careful with our wording and execution we can pull this off effectively in a way that our employees would feel like it was a benefit to them, and benefit the R&D organization as well."

A jury could interpret "budget reductions" subject to "legal cautions" to be a euphemism for required "layoffs," as Colby did.

Arria reiterated this strategy in several e-mail messages to Cermak later in 2017, including commenting that "[we] have a few creative ideas we are fl[e]shing out around early retirement packages to continue to make room for more early career talent." In a subsequent e-mail message to Cermak in July 2017, she

wrote: "As you are aware most of our action[s] have already occurred earlier this year and are noted here, but we do have some ideas around offering an early retirement package which would also help us make some room for some additional early career hires"; the attached document contained a list of "involuntary departures" that included Adams. A reasonable interpretation of this communication is that Arria viewed Adams's "involuntary departure" as one "action" from earlier in the year that helped make "room for . . . early career hires."

Colby also was involved in "age diversity" strategies, at least after the January 2017 reduction in force. He participated in college recruiting trips in 2017 and told a subordinate manager to "hold off" on "hiring people with experience" until after a meeting about college recruiting. Colby's updated 2017 goals from his superiors included "[i]mprov[ing] [Andover] team talent demographics mix th[r]ough early retirement program and university fresh talent recruiting." In addition, in Colby's deposition, he indicated that he was aware of the company's need for "a good succession plan," that he had been told to focus his hiring on "recent college graduates," and that he knew that diversity was one of the HBN division's goals.

Other evidence indicated pejorative attitudes toward the ability of older workers. A 2017 presentation listed weaknesses

of the HBN R&D Andover office, as opposed to HBN R&D's other locations (including the India office), which included an "[a]ging workforce" and "[l]ow energy level and speed." During the same year, Cermak suggested in an e-mail message that "people over 50y" should probably not be included in a talent development program, as they "should be oriented rather on the other side of [their] career stage."

d. Procedural history. Adams sued Schneider Electric in the Superior Court for age discrimination, alleging disparate treatment in violation of G. L. c. 151B, § 4 (1B).[3] The trial judge granted summary judgment, explaining that Adams conceded that Colby "harbored no discriminatory animus toward him" and produced no evidence to rebut Colby's testimony that he alone made the decision to select Adams for the reduction in force.

A split panel of the Appeals Court reversed the grant of summary judgment. Adams, 101 Mass. App. Ct. at 531. The Appeals Court majority explained that, taking the evidence in the light most favorable to Adams, there were two possible bases on which a fact finder could find that Adams's layoff was

---

[3] Adams also brought additional discrimination claims against Schneider Electric, including one that alleged disparate impact; claims against other Schneider Electric employees for aiding and abetting discrimination; and a claim that he was wrongfully terminated for reporting safety hazards. All of these claims either were voluntarily dismissed or have been waived on appeal. Adams, 101 Mass. App. Ct. at 517 n.2.

discriminatory. First, Adams could show that even if Colby "implemented the [reduction in force] neutrally," it was "tainted" -- that is, the decision to implement a layoff in the first place was a deliberate corporate strategy to shed older workers. Id. at 527. Second, Adams could show that, notwithstanding Colby's deposition testimony, "Colby was aware of management's age animus and therefore selected workers over age fifty . . . in accordance with company policy." Id. at 529. The Appeals Court further explained:

> "Colby's testimony that he did not consider age in the layoff is not sufficient to defeat summary judgment. At this stage, we must disregard Colby's claim that he used only neutral criteria to select employees for the [reduction in force]. On summary judgment, a court 'must disregard all evidence favorable to the moving party that the jury is not required to believe.'"

Id. at 531, quoting Reeves, 530 U.S. at 151.

The dissent would have affirmed the grant of summary judgment. Adams, 101 Mass. App. Ct. at 532 (Meade, J., dissenting). The dissent viewed evidence of an ageist corporate policy as mere "stray remarks" from nondecision makers "culled from over 9,000 pages of discovery materials." Id. at 535 (Meade, J., dissenting). In addition, the dissent rejected the proposition that Colby's testimony should be disregarded on summary judgment because a jury might not believe it. See id. at 535-536 (Meade, J., dissenting) ("A potential disbelief in Colby's testimony is not a 'specific fact' for purposes of Mass.

R. Civ. P. 56, 365 Mass. 824 [1974]"). Thus, there was no basis on which to disregard Colby's testimony for the purposes of summary judgment.

This court granted Schneider Electric's application for further appellate review.

2. Discussion. a. Standard of review. Adams contests the trial court's grant of summary judgment to Schneider Electric. We review a decision to grant summary judgment de novo. See Le Fort, 491 Mass. at 149. "'Summary judgment is appropriate where there is no material issue of fact in dispute and the moving party is entitled to judgment as a matter of law.' . . . 'We review the evidence in the light most favorable to the party against whom summary judgment entered,'" in this case, Adams. Id. at 148-149, quoting HSBC Bank USA, N.A. v. Morris, 490 Mass. 322, 326-327 (2022). Summary judgment is "a disfavored remedy in the context of discrimination cases based on disparate treatment . . . because the ultimate issue of discriminatory intent is a factual question." Bulwer, 473 Mass. at 689, quoting Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass. 437, 439 (1995).

b. McDonnell Douglas framework. General Laws c. 151B, § 4 (1B), bars age discrimination in employment: it is unlawful "[f]or an employer in the private sector, by himself or his agent, because of the age of any individual, . . . to discharge

from employment such individual."  To prove a claim of employment discrimination under the statute, a plaintiff must show "that he or she is a member of a protected class; that he or she was subject to an adverse employment action; that the employer bore 'discriminatory animus' in taking that action; and that that animus was the reason for the action (causation)." Bulwer, 473 Mass. at 680, quoting Lipchitz v. Raytheon Co., 434 Mass. 493, 502 (2001).  It is undisputed that Adams was a member of a protected class, as he was over forty years old,[4] and that his layoff constituted an adverse action.  Therefore, the question is whether he can show animus and causation.  See Bulwer, supra.

Plaintiffs in employment discrimination cases often rely on indirect or circumstantial evidence to prove these two elements. See Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 474 Mass. 382, 396 (2016), citing Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 39-40 (2005).  See also Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-100 (2003) (in discrimination cases, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence" [citation omitted]).  In determining whether a

---

[4] In the antidiscrimination statute, "[t]he term 'age' unless a different meaning clearly appears from the context, includes any duration of time since an individual's birth of greater than forty years."  G. L. c. 151B, § 1 (8).

plaintiff can survive summary judgment, we use "the familiar three-stage, burden-shifting paradigm first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973) (McDonnell Douglas)."  Verdrager, supra, quoting Sullivan, supra.

In the framework, first, the plaintiff must make out a "prima facie case of discrimination"; second, "the employer can rebut the presumption created by the prima facie case by articulating a legitimate, nondiscriminatory reason for its [employment] decision"; and third, the employee must provide evidence that the articulated reason is pretextual.  Bulwer, 473 Mass. at 681, quoting Blare, 419 Mass. at 441, 443.  McDonnell Douglas does not set out the elements of the claim or the burden of proof:  it is simply "a method of organizing evidence" "in the context of summary judgment" (citation omitted).[5]  Lipchitz, 434 Mass. at 508.  Although the plaintiff bears a burden of production in steps one and three, "the burden of persuasion at summary judgment remains with the defendants."  Bulwer, supra at 683.

Here, Adams produced sufficient evidence to make out a prima facie case.  In a reduction-in-force case, the plaintiff

---

[5] The McDonnell Douglas test is not used at trial.  Instead, "[w]e encourage trial judges to craft instructions that will focus the jury's attention on the ultimate issues of harm, discriminatory animus and causation."  Lipchitz, 434 Mass. at 508.

"establishes a prima facie case of discrimination by producing evidence that she is a member of a class protected by G. L. c. 151B; she performed her job at an acceptable level; she was terminated"; and "her layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination."[6] Sullivan, 444 Mass. at 41, 45. "[T]he plaintiff's initial burden of establishing a prima facie case is not intended to be onerous." Id. at 45. The first three of these elements are uncontested: Adams was over forty, and Colby characterized him as a "great problem solver" who did "very good work," despite selecting him for the layoff. As to the fourth element, the apparent desire of Schneider Electric's management to clear space for younger workers, described supra, constitutes circumstances that could raise an inference of discrimination. Moreover, some statistical evidence suggests that employees over fifty were terminated at higher-than-expected rates. See id. at 46 n.16 (statistical evidence may help prove prima facie case).

For the second prong of McDonnell Douglas, it is uncontested that Schneider Electric articulated a "legitimate, nondiscriminatory reason" for its decision to lay off Adams.

---

[6] The fourth element is typically framed as whether the employer replaced the plaintiff with someone similarly qualified. Sullivan, 444 Mass. at 41. However, this would be "nonsensical in a reduction in force case," because "the very purpose of a workforce reorganization is generally to reduce the number of employees." Id.

Bulwer, 473 Mass. at 681.  Colby explained that he had to implement a reduction in force for budgetary reasons.  Following advice from his supervisor, he selected Adams because "the majority of his time was spent doing work . . . for another division."  Adams's work outside of the R&D group had nothing to do with his protected class.

The question therefore becomes whether Adams has produced enough evidence to create a material dispute of fact regarding whether Schneider Electric's stated nondiscriminatory reason was pretextual.  Adams presented two theories that the Appeals Court determined satisfied this burden:  first, under the so-called "cat's paw" theory, Colby could have been an "innocent pawn" of a discriminatory corporate strategy to shed older workers, or second, Colby himself could have attempted to lay off older workers in furtherance of a discriminatory policy.  Adams, 101 Mass. App. Ct. at 528-529 & n.23.  We take each theory in turn.

c.  Discriminatory corporate strategy.  There was sufficient evidence in the summary judgment record to create a genuine issue of material fact whether Schneider Electric had a corporate policy to remove older staff to make room for younger workers.  On numerous occasions, corporate executives expressed concern about the age of their workforce, particularly in the division in which Adams worked.  They also expressed a preference for "more early career talents" and complimented a

manager in Adams's division who was "stocking his team with young talent." They also stressed the need to make room for this younger talent. Various strategies were discussed to achieve this goal, including budget reductions and voluntary and involuntary terminations of older workers. In a series of e-mail messages, for example, Arria, the global vice-president of HR, suggested "budget reductions" could make "room" for new younger hires.

Consistent with this strategy, budget reduction requirements were selectively enforced, with voluntary and involuntary terminations appearing to target older workers. The younger R&D office in India, for example, was given a budget reduction target that did not require layoffs, while the older Andover office was given one that did require layoffs. Despite mandatory budget reductions and required layoffs, hiring younger employees via college recruiting continued to be encouraged, including in Adams's group. Finally, Adams's statistical expert's findings were consistent with the theory of replacing older workers with younger ones, as the data, in the light most favorable to Adams, indicated that the layoffs had a disproportionate effect on employees over fifty.

The dissent in the Appeals Court considered much of this evidence, particularly the suggestive e-mail messages, to be mere stray remarks by "nondecision makers" that do not support a

finding of a prohibited motive. See Adams, 101 Mass. App. Ct. at 535 (Meade, J., dissenting). We disagree. Although "stray" ageist remarks by those in the company not involved in the relevant employment decision may not, at least alone, be probative of discrimination against a particular plaintiff, there was more than that here. See generally Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring); Diaz v. Jiten Hotel Mgt., Inc., 762 F. Supp. 2d 319, 333-338 (D. Mass. 2011) (critically reviewing history and practice of stray remarks doctrine).[7]

Multiple high ranking corporate executives, including those, such as Arria, involved in the layoffs, sounded a consistent theme. The corporate executives, including those in HR responsible for educating the workforce on discrimination, expressed a preference for younger workers, observed that there were too many older workers, and suggested ways to change the "demographics mix" through voluntary and involuntary termination of older workers while hiring new and younger college graduates.

---

[7] As suggested by the Appeals Court dissent, Adams, 101 Mass. App. Ct. at 535 n.7 (Meade, J., dissenting), we take this opportunity to clarify that any ageist, sexist, or racist remarks by those involved in the decisional process may be considered probative of discrimination against a particular plaintiff. Cf. Blare, 419 Mass. at 447 n.9, quoting Fontaine v. Ebtec Corp., 415 Mass. 309, 314 n.7 (1993) ("[I]solated or ambiguous remarks [by a decision maker], tending to suggest animus based on age, are insufficient, standing alone, to prove an employer's discriminatory intent").

See Fontaine, 415 Mass. at 314 n.7 (evidence sufficient for jury to find that top executive's remarks indicated "that he thought that the managers of these companies were too old and that younger managers should be found to take their places").  See also Wynn & Wynn, P.C. v. Massachusetts Comm'n Against Discrimination, 431 Mass. 655, 667 (2000), overruled on other grounds by Stonehill College v. Massachusetts Comm'n Against Discrimination, 441 Mass. 549 (2004), cert. denied sub nom. Wilfert Bros. Realty Co. v. Massachusetts Comm'n Against Discrimination, 543 U.S. 979 (2004) ("The statements by [the managing partner] . . . were not stray remarks.  They were made by a person with the power to make employment decisions").

Adams's division was also the focal point of these remarks, and all eight of the employees selected in the January 2017 layoff, including Adams, were over fifty.[8]  Consistent with the corporate strategy of replacing older workers with younger ones, in September 2017, after the forced layoffs, Colby told a

---

[8] The Appeals Court dissent accurately points out that the five oldest employees in the group were retained and that the statistical evidence as a whole may be challenged in a variety of ways.  Adams, 101 Mass. App. Ct. at 533 (Meade, J., dissenting).  While the jury will have the opportunity to consider this evidence as well, and the reasonable inferences that can be drawn from it, such evidence is not sufficient to support an award of summary judgment for Schneider Electric on this record as a whole.  To the contrary, it shows that a genuine issue of material fact exists when viewed in light of the plaintiff's competing evidence.

manager under him to "hold off" on "hiring people with experience" until after a meeting regarding an "upcoming recruiting trip." The next month, Colby was given an explicit annual performance goal along the same lines -- to improve the "demographics mix" of his team through college recruiting and early retirements.

All of this evidence was sufficient to create a genuine issue of material fact whether Adams's group of older employees, and thus Adams, were targeted for layoffs to make room for younger hires.

Under this theory, Colby's knowledge of the strategy or lack thereof is unnecessary. It would constitute unlawful discrimination if executives at the company targeted the HBN R&D group for layoffs in the first place because of the age of the employees in that group, even if Colby himself was ignorant of the larger scheme when he selected individual employees for termination. "Even if Colby were the sole decision maker for which particular employees would be [laid off] and the innocent pawn of an undisclosed corporate strategy tainted by unlawful discriminatory animus, a rational fact finder could conclude that the [reduction in force] was unlawful." Adams, 101 Mass. App. Ct. at 527-528.

This type of fact pattern has been called a "cat's paw" case, after a fable in which a monkey convinces a cat to roast

chestnuts, and then makes off with the finished product, leaving the cat with a burned paw and no chestnuts to show for it. See Staub v. Proctor Hosp., 562 U.S. 411, 415 n.1 (2011). See also Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2350 (2021), quoting Webster's New International Dictionary 425 (2d ed. 1934) ("A 'cat's paw' is a 'dupe' who is 'used by another to accomplish his purposes'"). Although this court has not used that evocative terminology, it is clear that the employment discrimination statute supports liability for such "monkey business." The statute makes it illegal "[f]or an employer in the private sector, by himself or his agent" to subject an individual to an adverse employment action on the basis of age. G. L. c. 151B, § 4 (1B). A corporate employer acts through multiple agents. See Staub, supra at 420 ("An employer's authority to reward, punish, or dismiss is often allocated among multiple agents," not just "[t]he one who makes the ultimate decision"). A discriminatory corporate decision is not insulated from liability just because it is implemented by managers with limited decision-making authority, unaware that they are being used as "pawns" or "paws."

Our employment cases have recognized the issue of corporate responsibility, although generally in the context of an ultimate decision maker relying on biased input from lower rungs of the

corporate ladder.[9]  For example, in <u>Bulwer</u>, a hospital's decision

not to renew the plaintiff doctor's contract was made by an "ad

hoc committee" that relied on allegedly racially biased

performance evaluations and testimony from other physicians at

the hospital.  <u>Bulwer</u>, 473 Mass. at 686-688.  We explained:

> "Where 'the decision makers relied on the recommendations
> of supervisors [whose motives have been impugned], the
> motives of the supervisors should be treated as the motives
> for the decision. . . .  An employer [may not] insulate its
> decision by interposing an intermediate level of persons in
> the hierarchy of decision, and asserting that the ultimate
> decision makers acted only on recommendation.'"

<u>Id</u>. at 688, quoting <u>Trustees of Forbes Library</u> v. <u>Labor</u>

<u>Relations Comm'n</u>, 384 Mass. 559, 569-570 (1981), overruled on

other grounds by <u>Wynn & Wynn, P.C.</u>, 431 Mass. at 669.  See

<u>Verdrager</u>, 474 Mass. at 403 ("adverse employment decisions . . .

were made by individuals who were acting independently from the

plaintiff's immediate supervisors and who were not accused of

harboring the discriminatory views alleged to have been held by

those supervisors," but decisions were "based . . . on the

opinions" of those supervisors); <u>Trustees of Forbes Library</u>, 384

Mass. at 570 (library trustees fired employee based on

---

[9] This is consistent with the origins of the doctrine.  In <u>Shager</u> v. <u>Upjohn Co.</u>, 913 F.2d 398, 405 (7th Cir. 1990), in which Judge Richard Posner brought the "cat's paw" language into antidiscrimination law, the plaintiff employee's biased manager recommended to the "Career Path Committee" that the employee be fired.  In <u>Staub</u>, 562 U.S. at 415, likewise, the HR department fired the employee based on his biased supervisors' reports.

recommendations from supervisors who intended to retaliate against employee for protected union activity).

Although the discrimination may have taken place at a different level of decision-making in the instant case, that is to say among top managers rather than mid-level managers or supervisors, the result is still the same:  the company remains responsible for the discrimination.  Corporate liability is perhaps even more clear-cut, as the allegedly discriminatory action that resulted in termination was taken further up the corporate hierarchy.

Federal courts have found employment discrimination in situations similar to that in this case.  For example, a corporation was liable for a discriminatory firing where it was found to have a long-standing practice of age discrimination "under the stewardship of its president," even though the employee's "immediate supervisor," the "key" decision maker, did not appear to be biased.  Freeman v. Package Mach. Co., 865 F.2d 1331, 1334, 1342 (1st Cir. 1988) ("The battle plan of the admiral is a valid datum in assessing the intentions of the captain of a single ship in the flotilla").  Likewise, summary judgment was improper where a company's chief executive officer had indicated that he wanted to fire the plaintiff in retaliation for a wage-related lawsuit, although the plaintiff was ultimately fired by someone else.  Travers v. Flight Servs.

& Sys., Inc., 737 F.3d 144, 145 (1st Cir. 2013). "[T]he retaliatory animus resided at the apex of the organizational hierarchy. . . . A rational juror could conclude that such strongly held and repeatedly voiced wishes of the king, so to speak, likely became well known to those courtiers who might rid him of a bothersome underling." Id. at 147. See Cravens vs. Pact, Inc., U.S. Dist. Ct., No. 1:19-cv-01357 (D.D.C. Feb. 27, 2020) (company could be liable under cat's paw theory where chief executive officer allegedly had sexist attitudes that influenced corporate actions). Similarly, this court has affirmed corporate liability where a law firm's biased managing partner instructed the management committee not to hire the plaintiff. Wynn & Wynn, P.C., 431 Mass. at 667 n.24.

d. Colby's credibility. The Appeals Court also concluded that a "rational fact finder could find that Colby was aware of management's age animus and therefore selected workers over age fifty . . . in accordance with company policy." Adams, 101 Mass. App. Ct. at 529. We agree with this conclusion, but we disagree in part with the court's analysis, particularly its suggestion at the end of its opinion that it must disregard all of Colby's testimony at the summary judgment stage, simply because he is an interested witness and a jury might not find him credible.

As the dissent explained, a fact is not disputed just because it has been put forth by the moving party. Rather, the nonmoving party bears a burden of production: it is "required to produce evidence sufficient to create a genuine dispute of material fact." Le Fort, 491 Mass. at 149, quoting Haverty v. Commissioner of Correction, 437 Mass. 737, 759 n.28 (2002), S.C., 440 Mass. 1 (2003). See Barron Chiropractic & Rehabilitation, P.C. v. Norfolk & Dedham Group, 469 Mass. 800, 804 (2014) ("If the moving party . . . asserts the absence of any triable issue, the nonmoving party must respond and make specific allegations sufficient to establish a genuine issue of material fact"). See also Sullivan v. Lawlis, 93 Mass. App. Ct. 409, 415 (2018).[10]

Reeves, the United States Supreme Court case cited by the Appeals Court, is not to the contrary. The Appeals Court

---

[10] The summary judgment standard is no different in an employment discrimination case. See Reeves, 530 U.S. at 148, quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993) ("trial courts should not 'treat discrimination differently from other ultimate questions of fact'"); Yee v. Massachusetts State Police, 481 Mass. 290, 302 (2019) ("Yee may satisfy this [summary judgment] burden by offering evidence which, when viewed in the light most favorable to Yee, is sufficient to convince a reasonable jury that the reasons the State police offered . . . were not the real reasons"); Bulwer, 473 Mass. at 680. Indeed, under the Appeals Court's standard, step two of the McDonnell Douglas test would be pointless: courts could simply disregard an employer's proffered legitimate, nondiscriminatory reason because a jury is not required to believe it.

majority appears to have taken the phrase "disregard all evidence favorable to the moving party that the jury is not required to believe" out of context.  The full context from Reeves shows that the Supreme Court simply meant that when deciding judgment as a matter of law, courts should avoid weighing evidence:

> "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. . . .  'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'  [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).]  Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.  See [9A C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2529, at 299 (2d ed. 1995)].  That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'  Id."

Reeves, 530 U.S. at 150-151.  See LaFrenier v. Kinirey, 550 F.3d 166, 168-169 (1st Cir. 2008) (clarifying meaning and application of Reeves and stating that on "summary judgment we need not exclude all interested testimony, specifically testimony that is uncontradicted by the nonmovant" [citation omitted]); Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 271-272 (3d Cir. 2007) ("in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested

witness"); <u>Luh</u> v. <u>J.M. Huber Corp</u>., 211 Fed. Appx. 143, 146 (4th Cir. 2006) (to be disregarded, "testimony must display some indicia that it is not credible"); <u>Stratienko</u> v. <u>Cordis Corp</u>., 429 F.3d 592, 597-598 (6th Cir. 2005). In other words, a court must determine judgment as a matter of law based on all uncontested evidence, that is, evidence favoring the nonmovant and "uncontradicted and unimpeached" evidence favoring the movant. Uncontradicted and unimpeached evidence, even from interested witnesses favoring the moving party, is to be considered on summary judgment. In evaluating evidence favoring the moving party, the Supreme Court did not say "only" evidence from a disinterested party should be given credence. Rather, it explained that uncontradicted and unimpeached evidence shall be given credence, "at least to the extent" that it is provided by disinterested parties. Indeed, in <u>Reeves</u>, <u>supra</u> at 144, an age discrimination case, the Supreme Court specifically stated that the plaintiff had "made a substantial showing that [the employer's] explanation" for his firing "was false." Such analysis figured prominently in the Court's decision. See <u>id</u>. at 151.

Thus, to survive summary judgment, Adams could not simply state that Colby was an interested witness and thus his testimony could be disregarded. Adams was required instead to identify specific material in the record that would support a

jury finding that Colby relied on age in selecting employees for the reduction in force, despite his testimony to the contrary.

Although the Appeals Court may have confused this requirement, the record, which we review de novo, establishes that Adams met his burden. Le Fort, 491 Mass. at 149. As reasons to doubt Colby's assertion, the summary judgment record, as highlighted by the Appeals Court, includes (1) the statements made by corporate executives demonstrating discriminatory animus against older employees; (2) that Colby had met with Sharma and Arria, who had articulated such views, while formulating the layoff list, and thus "a rational jury could infer that the wishes of senior management were expressed in those meetings"; (3) everyone on Colby's layoff list was over fifty; and (4) Colby's efforts to dissuade Granato from rehiring Adams for another division. Adams, 101 Mass. App. Ct. at 529-531. To that, we would add that Colby stated shortly after the layoffs that he knew that age diversity was a goal of the division and that he had been asked to focus his hiring on recent college graduates.

The fact that Adams admitted that he did not believe that Colby bore discriminatory animus toward him does not change this analysis. Adams's statement was not a legal conclusion that Colby did not select him for the reduction in force for a proscribed reason. It merely reflected his belief that Colby

was not personally biased against him. Indeed, like his view that Colby was unbiased, other parts of Adams's deposition testimony about the mechanics of the reduction in force proved to be inconsistent with what was learned in discovery and could be disregarded by a jury if introduced at trial -- for example, Adams stated that his layoff was entirely HR's decision.

In sum, on these facts, a jury could find that Colby inferred (or was directly told) that his managers wanted him to select older employees for the reduction in force to improve the demographic balance of the R&D team, and that he did so. In other words, Adams has produced circumstantial evidence that satisfies his burden of production to show a dispute of fact regarding Colby's testimony. See Yee v. Massachusetts State Police, 481 Mass. 290, 302 (2019); Bulwer, 473 Mass. at 682.

3. Conclusion. Because corporate decisions involve multiple actors, an innocent decision maker can further a discriminatory purpose. Here, Adams produced evidence from which a jury could find that he was selected for the reduction in force as part of a corporate strategy to lay off older workers. Although this theory does not require that Colby knew about the strategy, a jury could also find that he did and that he selected Adams in accordance with it. As Adams produced sufficient evidence to create a dispute of fact regarding whether he was terminated due to discriminatory animus, the

grant of summary judgment is reversed, and the matter is remanded to the Superior Court for further proceedings.

<u>So ordered</u>.